**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GENIUS GROUP LIMITED, individually and on
behalf of all others similarly situated,

                        Plaintiff,

          vs.

CITADEL SECURITIES LLC, and VIRTU
AMERICAS LLC,

                    Defendants.

---

Case No. 1:25-CV-09546 (VEC)

**ORAL ARGUMENT REQUESTED**

 

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
GENIUS GROUP LIMITED'S MOTION
<u>FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ....................................................................................................................4

    A.    The Parties ................................................................................................4

    B.    Background on Genius................................................................................4

    C.    Genius's Equity Issuances and Related Litigation.................................................6

    D.    Genius's Investigation of Alleged Market Manipulation and This Lawsuit................................................................................................8

ARGUMENT .....................................................................................................................10

I.    GENIUS FAILS THE ADEQUACY TEST FOR LEAD PLAINTIFF APPOINTMENT ................................................................................................12

    A.    Several Unique Defenses Render Genius Unsuitable for Lead Plaintiff Appointment ................................................................................................13

        1.    Genius's Claims in Separate Litigation Give Rise to Unique Damages Defenses ................................................................................................13

        2.    Genius Is Subject to a Unique Statute of Limitations Defense.................16

        3.    Genius Is Subject to a Unique Reliance Defense.....................................18

    B.    Genius's Misconduct Casts Further Doubt on Its Ability to Serve as Lead Plaintiff ................................................................................................20

II.    GENIUS FAILS THE TYPICALITY REQUIREMENT FOR LEAD PLAINTIFF APPOINTMENT ................................................................................................21

III.    PROPOSED CO-LEAD CLASS COUNSEL IS INADEQUATE ....................................25

CONCLUSION ...................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alki Partners, L.P. v. Vatas Holding GmbH*,
    769 F. Supp. 2d 478 (S.D.N.Y. 2011)
    *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012)............ 18, 19

*Andrada v. Atherogenics, Inc.*,
    2005 WL 912359 (S.D.N.Y. Apr. 19, 2005)........................................................................ 22

*ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*,
    579 F.3d 143 (2d Cir. 2009).................................................................................................. 26

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    2008 WL 850473 (S.D.N.Y. Mar. 27, 2008) .................................................................. 25, 26

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)............................................................................................. 18, 19

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................................................................. 19

*Batter v. Hecla Mining Co.*,
    2020 WL 1444934 (S.D.N.Y. Mar. 25, 2020) ...................................................................... 12

*Berdeaux v. Onecoin Ltd.*,
    2019 WL 3815147 (S.D.N.Y. July 11, 2019) ...................................................................... 27

*Biocad JSC v. F. Hoffmann-La Roche Ltd.*,
    2022 WL 268102 (S.D.N.Y. Jan. 28, 2022) ........................................................................ 26

*Bosch v. Credit Suisse Grp. AG*,
    2022 WL 4285377 (E.D.N.Y. Sept. 12, 2022) .................................................................... 11

*Chopper Trading LLC v. Allston Trading LLC*,
    2025 WL 3484934 (N.D. Ill. Dec. 4, 2025)......................................................................... 17

*Christiansen v. Spectrum Pharms., Inc.*,
    2025 WL 2234041 (S.D.N.Y. Aug. 4, 2025) .................................................................. 14, 20

*City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011)................................................................................................. 16

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010).................................................................................. 15

*Di Scala v. ProShares Ultra Bloomberg Crude Oil*,
  2020 WL 7698321 (S.D.N.Y. Dec. 28, 2020) ..................................................... 13

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).......................................................................................... 15

*EMA Fin., LLC v. NFusz, Inc.*,
  444 F. Supp. 3d 530 (S.D.N.Y. 2020)................................................................ 24

*Endovasc Ltd., Inc. v. J.P. Turner & Co., LLC*,
  2004 WL 634171 (S.D.N.Y. Mar. 30, 2004)
  *aff'd in part, vacated in part*, 169 F. App'x 655 (2d Cir. 2006)............................ 23

*Faris v. Longtop Fin. Techs. Ltd.*,
  2011 WL 4597553 (S.D.N.Y. Oct. 4, 2011) .................................................. 20, 21

*Finocchiaro v. NQ Mobile, Inc.*,
  2016 WL 7031613 (S.D.N.Y. Dec. 1, 2016) ....................................................... 11

*Gamm v. Sanderson Farms, Inc.*,
  2017 WL 11710545 (S.D.N.Y. Feb. 13, 2017)..................................................... 27

*Gross v. AT&T Inc.*,
  2019 WL 3500496 (S.D.N.Y. July 31, 2019) ...................................................... 13

*Guo v. Tyson Foods, Inc.*,
  2022 WL 5041798 (E.D.N.Y. Sep. 30, 2022)...................................................... 11

*Guo v. Tyson Foods, Inc.*,
  2023 WL 3765052 (E.D.N.Y. June 1, 2023) ....................................................... 11

*Gurary v. Winehouse*,
  190 F.3d 37 (2d Cir. 1999)................................................................................. 18

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharm. Indus. Ltd.*,
  529 F. Supp. 3d 385 (E.D. Pa. 2021) ...................................................... 14, 15, 16

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
  2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ...................................................... 22

*In re Critical Path, Inc. Sec. Litig.*,
  156 F. Supp. 2d 1102 (N.D. Cal. 2001) ........................................................ 22, 24

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
  2020 WL 5548856 (S.D.N.Y. Sept. 16, 2020)................................................ 13, 18, 21, 25

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  210 F.R.D. 476 (S.D.N.Y. 2002) ........................................................................ 18

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  2008 WL 2941215 (S.D.N.Y. July 30, 2008) ........................................................................ 20

*In re Network Assoc., Inc. Sec. Litig.*,
  76 F. Supp. 2d 1017 (N.D. Cal. 1999) .................................................................................. 20

*In re Veon Ltd. Sec. Litig.*,
  2022 WL 1284547 (S.D.N.Y. Apr. 29, 2022) ................................................................. 16, 18

*Isquith v. Caremark Int'l, Inc.*,
  136 F.3d 531 (7th Cir. 1998) .................................................................................................. 23

*Khunt v. Alibaba Grp. Holding Ltd.*,
  102 F. Supp. 3d 523 (S.D.N.Y. 2015) .................................................................................... 25

*Lampkin v. UBS Fin. Servs.*,
  925 F.3d 727 (5th Cir. 2019) .................................................................................................. 23

*Lang v. Tower Grp. Int'l, Ltd.*,
  2014 WL 12779212 (S.D.N.Y. June 17, 2014) ................................................................ 22, 24

*Malasky v. IAC/Interactivecorp*,
  2004 WL 2980085 (S.D.N.Y. Dec. 21, 2004) ........................................................................ 27

*May v. Barclays PLC*,
  2025 WL 887300 (S.D.N.Y. Mar. 21, 2025) .......................................................................... 23

*McCormack v. Dingdong (Cayman) Ltd.*,
  2022 WL 17336586 (S.D.N.Y. Nov. 30, 2022) ................................................................ 10, 11

*Mura v. Thomas*,
  2020 WL 2086039 (S.D.N.Y. Apr. 30, 2020) ................................................................... 25, 27

*Newman v. Eagle Bldg. Techs.*,
  209 F.R.D. 499 (S.D. Fla. 2002) ............................................................................................ 20

*Osorio-Franco v. Spectrum Pharms., Inc.*,
  2023 WL 2586909 (S.D.N.Y. Mar. 21, 2023) ........................................................................ 12

*Patel v. St. John's Univ.*,
  2020 WL 13157553 (E.D.N.Y. Dec. 27, 2020) ...................................................................... 27

*Rice v. Genworth Fin. Inc.*,
  2017 WL 3699859 (E.D. Va. Aug. 25, 2017) ........................................................................ 14

*Rodriguez v. DraftKings Inc.*,
  2021 WL 5282006 (S.D.N.Y. Nov. 12, 2021) .................................................................. 12, 13

*Savino v. Comput. Credit, Inc.*,
  164 F.3d 81 (2d Cir. 1998) ................................................................ 20

*Schaffer v. Horizon Pharma PLC*,
  2016 WL 3566238 (S.D.N.Y. June 27, 2016) ..................................... 13

*Schiro v. Cemex, S.A.B. de C.V.*,
  438 F. Supp. 3d 194 (S.D.N.Y. 2020) ............................................. 16, 17

*Steginsky v. Xcelera, Inc.*,
  2015 WL 1036985 (D. Conn. Mar. 10, 2015)
  *aff'd*, 658 F. App'x 5 (2d Cir. 2016) ................................................. 20

*Wang v. Shun Lee Palace Rest., Inc.*,
  2023 WL 2734328 (S.D.N.Y. Mar. 31, 2023) ................................... 25, 26

*Weltz v. Lee*,
  199 F.R.D. 129 (S.D.N.Y. 2001) ...................................................... 25

**Statutes**

15 U.S.C. § 78u-4(a)(3)(B)(i) ............................................................. 11

15 U.S.C. § 78u-4(a)(3)(B)(v) ............................................................ 25

15 U.S.C. § 78u-4(a)(B)(iii)(I) ........................................................... 12

15 U.S.C. § 78u-4(a)(B)(iii)(II) .......................................................... 12

18 U.S.C. § 1964(c) ........................................................................... 16

28 U.S.C. § 1658(b) .......................................................................... 16

**Rules**

Fed. R. Civ. P. 23(a)(2) ..................................................................... 11

Fed. R. Civ. P. 23(a)(3) ..................................................................... 11

Fed. R. Civ. P. 23(a)(4) ..................................................................... 11

**Other Authorities**

Brandon Kochkodin, "The Loony Conspiracy Theory Threatening Wall Street," FORBES
  (Jun. 22, 2023) ................................................................................ 25

H.R. Rep. No. 104-369, at 32 (1995) ................................................. 11

Defendants Citadel Securities LLC ("Citadel Securities") and Virtu Americas LLC ("Virtu") respectfully submit this memorandum of law in opposition to Plaintiff Genius Group Limited's ("Genius") motion for appointment as lead plaintiff and approval of lead counsel (ECF 27) ("Motion").

## PRELIMINARY STATEMENT

Citadel Securities and Virtu recognize that it is rare for defendants to challenge a lead plaintiff's appointment motion. But this case presents extraordinary circumstances: Genius, a penny stock issuer, makes an unprecedented motion to represent a class of *its own stockholders*, to pursue class-wide damages caused by Genius's *own* precipitous stock price declines. These facts alone make Genius an inadequate and atypical lead plaintiff. But Genius also has a long history of misconduct that plainly disqualifies it from serving as a fiduciary for a class of its own shareholders. Defendants are thus compelled to bring to the Court's attention the numerous grounds warranting denial of Genius's application to serve as lead plaintiff.

In this lawsuit, Genius sues market-makers—firms that execute buy and sell orders to provide market liquidity—for allegedly "manipulating" the market and causing Genius's stock price to decline. But Genius ignores a series of significant issues unrelated to Defendants' alleged conduct that directly impacted the value of Genius stock during the relevant period—and Genius's fitness to serve as lead plaintiff. Among other things, Genius announced a warning letter from the New York Stock Exchange ("NYSE") for making incomplete and inconsistent investor disclosures, filed multiple lawsuits relating to the manipulation of its stock alleging facts unrelated to this action, and is subject to an order issued by a California state regulator involving allegations of financial-aid fraud at a now-defunct university owned by the company. Instead of taking responsibility for the economic consequences of its own actions, Genius continues to blame others for its lackluster performance and filed this lawsuit, seeking to represent a putative class of

"similarly situated" investors in Genius stock. But passive investors who held Genius's publicly-traded stock are hardly "similarly situated" to the company itself, whose own conduct and litigation posture actually place it in direct conflict with the class it seeks to represent.

Nothing in the legislative history of the Private Securities Litigation Reform Act of 1995 ("PSLRA") indicates that Congress intended or even contemplated that issuers would represent their own stockholders in class action lawsuits. Genius cites no precedent for its extraordinary request, as none exists. And even if the PSLRA does not outright preclude Genius from serving as lead plaintiff, Genius comes nowhere close to meeting the requirements for such an appointment. A lead plaintiff must demonstrate that it will fairly and adequately protect all putative class members' interests and that its claims are typical of putative class members' claims. Genius does not—and cannot—meet either standard for multiple, independent reasons.

*First*, Genius cannot satisfy the adequacy requirement because it faces unique defenses and its record of misconduct raises serious doubts regarding its ability to represent the putative class. At this stage, the Court need not resolve the merits of any such issues. It need only determine whether Defendants have rebutted the presumption of adequacy by showing Genius's appointment *potentially risks* injecting unique defenses, conflicts, and credibility disputes that distract from issues common to the class. For the reasons below, Defendants have done exactly that.

As for unique defenses, Genius alleges in another pending lawsuit that misconduct *other than* Defendants' alleged spoofing caused declines in its stock price during the putative class period. Genius therefore faces a unique conflict, which would divert attention and resources from issues common to the putative class, in seeking to assign responsibility for the same stock price declines to different defendants for different alleged misconduct across different actions. Genius also claimed to have "proof" of market manipulation years before it commenced this action, and

the details of Genius's actual knowledge of alleged manipulation will raise unique, fact-intensive defenses specific to Genius. Genius's investigation—commenced shortly after its IPO and repeatedly described in company disclosures—demonstrates that Genius discovered the facts constituting the violations alleged in the Complaint well over two years before filing suit, subjecting Genius to a statute of limitations defense. The investigation also demonstrates that Genius could not and did not rely on an assumption of a market free from manipulation throughout the alleged class period.

Additionally, Genius's prior misconduct raises serious doubt regarding its ability to serve as lead plaintiff. Genius announced a warning letter from NYSE regarding its failure to disclose material information to investors and its provision of inconsistent information to the public, yet now seeks to represent those very same investors. Additionally, Genius owned a for-profit college that was stripped of accreditation and forced to close after state regulators raised allegations of extensive financial aid fraud. Such misconduct provides ample reason not to place Genius in a position of trust on behalf of the putative class.

*Second*, Genius cannot satisfy the typicality requirement given the atypical nature of its transactions in Genius common stock. Courts routinely decline to appoint as lead plaintiffs investors with idiosyncratic trading patterns or who invested in different securities from other putative class members. Here, Genius repeatedly issued shares in private transactions at *contractually set prices different from those available in the public market*. In doing so, Genius did not sell shares in reliance on the market price for Genius common stock. Indeed, while Genius claims it "sold or otherwise disposed of" a portion of its stock through at-the-market offerings, the vast majority (approximately 80%) was "disposed of" through a range of atypical transactions— including conversions, warrant exercises, option exercises, and merger consideration—that are

fundamentally different from sales of Genius stock by other stockholders in the public market. Also unlike secondary sales by other investors, Genius's sales diluted all other shareholders and would have placed downward pressure on its stock price irrespective of any alleged spoofing.

*Finally*, the defects in Genius's application are compounded by its choice of Christian Attar as proposed co-lead counsel. A court in this District found that Christian Attar's principal, James Wes Christian, presented "baseless" and "simply ridiculous" allegations against a defendant in another market manipulation case, and the Second Circuit affirmed. This creates significant doubt as to Mr. Christian's ability to represent the putative class, and provides sufficient grounds to disqualify Mr. Christian's firm. Genius's unsupported and unexplained request to appoint three law firms as co-lead counsel further underscores why Christian Attar's involvement in this case is inappropriate and would lead to inefficiencies and excessive fees for putative class members.

## **BACKGROUND**

### A.    **The Parties**

Genius is a Singapore-based holding company that presents itself as a cross between an education technology company and Bitcoin treasury but, in reality, operates as a loosely integrated collection of subsidiaries with limited strategic coherence. *See* Ex. 1 (2024 Form 20-F) at 70; Ex. 2 (Genius: About Our Company). Defendants are SEC-registered broker-dealers operating as market makers in U.S. equities and other securities, trading for both their customers and their own accounts. *See* Compl. ¶¶ 9-10.

### B.    **Background on Genius**

Genius went public in April 2022. Since then, the company's stock price has declined by over 99% and hit several 52-week lows in each of 2024 and 2025. Compl. ¶ 76 at Figure 5; Ex. 3 (Stock Price Chart). The company has operated at a net loss in every year following its IPO and

has disclosed "substantial doubt about [its] ability to continue as a going concern." Ex. 1 (2024 Form 20-F) at F-3.

In July 2023, Genius issued a press release disclosing that it had received a warning letter from NYSE because it had violated Section 401 of the Company Guide, which requires listed companies to publicize certain information necessary for informed investing. Ex. 4 (8/1/23 Press Release). Specifically, NYSE took issue with Genius and "the manner of disclosures" relating to events from March 2023 and, according to the Company's public statement, found that Genius "violated Section 401 by failing to disclose material information in compliance with the Company Guide requirements and by providing inconsistent information to the investing public." *Id.*

In 2024, Genius and its CEO were subject to an order from the California Department of Consumer Affairs ("CDCA") relating to a for-profit college, the University of Antelope Valley ("UAV"), that Genius acquired in July 2022. Ex. 5 (7/11/22 Press Release). Shortly after Genius took over the college, regulators placed UAV on probation, stripped it of accreditation, and ultimately forced UAV to close in 2024. Ex. 6 (8/22/23 WSCUC Action Letter); Ex. 7 (2/29/24 CBPPE Emergency Decision); Ex. 8 (5/10/24 WSCUC Action Letter). Under Genius's ownership, UAV employees allegedly received only 25% of their salary in cash, less deductibles, with the rest paid in Genius shares. *See* Ex. 9 (2/22/24 Inside Higher Ed Article). In June 2024, the CDCA issued a Stipulated Surrender of Approval to Operate an Accredited Institution and Order ("Surrender Order") against UAV, to which Genius and its CEO are also subject. *See* Ex. 10. The Surrender Order alleged that UAV failed to pay financial aid refunds to hundreds of enrolled UAV students and made "untrue or misleading statements" regarding the disbursement of such financial aid to students. *Id.* at Ex. A, 14. The accusations point to a Genius employee who also served as

UAV's CFO as having personally taken possession of refund checks "to prevent the distribution of them to students." *Id.*

### C.    Genius's Equity Issuances and Related Litigation

Genius routinely uses its own stock as currency in private transactions.  In 2022, for example, Genius issued a convertible note ("2022 Convertible Note") in the principal amount of $18,130,000 that was convertible into common stock "at an initial fixed price of $5.17."  Ex. 11 (2023 Form 20-F) at 89.  In 2022 and 2023, Genius also issued over 46 million shares to fulfill conversion requests from investors.  *See* Ex. 12 (2022 Form 20-F) at F-35; Ex. 11 (2023 Form 20-F) at F-44.  Genius has also offered employee stock option incentive plans, allowing eligible employees to buy common stock at fixed prices.  A total of 73,428 options were exercised in 2022. Ex. 12 (2022 Form 20-F) at F-38.

Genius has similarly issued stock to warrant holders.  For example, in May 2024, Genius raised approximately $3.8 million through the exercise of warrants for up to 10,950,451 ordinary shares at the then-current exercise price of $0.35/share in a private placement.  Ex. 13 (5/20/24 Press Release).  Genius has designated these issuances as sales for which it seeks damages in this action.  *See* ECF 29-2.

Genius has also used its common stock to pay all or part of the consideration in several transactions with third parties:

| Acquired Subsidiary | Consideration | Closing Date | Closing Date Stock Price |
|---|---|---|---|
| University of Antelope Valley | $6 million in Genius shares based on IPO price of $6/share | July 7, 2022 | $64.70/share |
| Education Angels | 100% in Genius shares, set at pre-split price of $34.87/share | April 30, 2022 | $57.10/share |

| Acquired Subsidiary | Consideration | Closing Date | Closing Date Stock Price |
|---|---|---|---|
| Property Investors Network | 10% cash and 90% Genius shares, set at the pre-split price of $34.87/share | April 30, 2022 | $57.10/share |
| Revealed Films | $7 million in Genius shares at a price of $5.17/share | October 4, 2022 | $21.70/share |
| FB Prime Source Acquisition LLC (from LZG International, Inc. d/b/a FatBrain AI) | 73,873,784 shares of Genius common stock | March 14, 2024 | $3.97/share[1] |

*See* Ex. 12 (2022 Form 20-F) at F-22–F-25.

Genius has filed several lawsuits related to its equity issuances. In February 2023, Genius sued its counterparties to the 2022 Convertible Note, alleging that the note was "toxic" and "resulted in Genius being required to issue as many as 60 million new shares, with an enormous dilutive effect." *See* Compl. ¶ 1 & n.1, *Genius Grp. Ltd. v. Alto Opportunity Master Fund, SPC – Segregated Master Portfolio B*, 23-cv-01639-LAK (S.D.N.Y.) (ECF 1). Genius withdrew its complaint one month after filing and admitted defendants had not violated federal securities laws or committed wrongdoing under the 2022 Convertible Note. *See* Ex. 14 (3/29/23 Press Release).

In November 2024, Genius sought a temporary restraining order and preliminary injunction prohibiting LZG International, Inc. ("LZG") from transferring its shares of Genius common stock or participating in shareholder meetings or voting, pending arbitration. Compl. ¶¶ 21-24, *Genius Grp. Ltd. v. LZG Int'l, Inc.*, 24-cv-8464 (S.D.N.Y.) (ECF 1). Genius alleged that it issued 73 million shares to LZG as consideration for acquired assets but later discovered that LZG had failed

---

[1]    As explained below, this transaction is subject to an ongoing dispute between Genius and the seller. *See* pages 7-8.

to disclose material encumbrances and conflicting third-party rights affecting those assets. *Id*. ¶¶ 56-62. *Genius Grp. Ltd. v. LZG Int'l, Inc.*, 2025 WL 815346, at \*8 (S.D.N.Y. Mar. 13, 2025). Genius obtained an injunction prohibiting LZG from disposing of its Genius shares pending arbitration.

Then, in March 2025, Genius filed a RICO complaint against LZG's principals alleging that they engaged in a fraudulent scheme to induce Genius to issue millions of shares and pay over $6 million, in an effort to seize control of Genius. The complaint alleges that the LZG principals made false statements to the court to obtain an injunction prohibiting Genius from issuing shares, which prevented Genius from proceeding with a previously approved securities offering, leading "to a precipitous drop in Genius's share price and market capitalization." Compl. ¶ 166, *Genius Grp. Ltd. v. Ritz*, 25-cv-21496 (S.D. Fla.) ("RICO Action") (ECF 1).

### D.    Genius's Investigation of Alleged Market Manipulation and This Lawsuit

Despite its history, Genius has long blamed market manipulation for its stock price declines following the 2022 IPO. Just months after going public, Genius alleged, based on an "investigation" led by its outside counsel, Wes Christian, that third-party "manipulators" had depressed its share price. The company and its outside counsel, Christian Attar (f/k/a "Christian Levine")[2] and Warshaw Burstein, LLP ("Warshaw Burstein"), made numerous disclosures regarding their findings of alleged market manipulation. For example:

- **November 10, 2022:** Genius announced its executive management and board of directors "after carefully reviewing the recent trading history of its ordinary shares believe[] that the Company may have been the target of a market manipulation scheme that, has adversely affected its share price." Ex. 15 (11/10/22 Press Release). Genius retained outside counsel to investigate. *See id.*

---

[2]    As discussed *infra*, pages 25-27, James Wes Christian, a principal of proposed co-lead counsel Christian Attar, has been sanctioned in another alleged market manipulation case, and has two sanctions motions pending against him for similar misconduct.

- **January 4, 2023:** Genius announced Christian Attar and Warshaw Burstein's investigation "indicate[d] that certain individuals and/or companies appear to have sold (but not delivered) a significant amount of the stock of the company, which is illegal and appears to be part of a market manipulation scheme seeking to artificially depress the price of the securities of the company."  Ex. 16 (1/4/23 Press Release).

- **January 17, 2023:** Genius's CEO stated in an interview that investigation by outside counsel and a shareholder intelligence services company revealed that Genius's stock had been manipulated, and Genius "had evidence of it."  Ex. 17 (1/17/23 Fox News Interview).

- **January 19, 2023:** Genius announced its board of directors created an "Illegal Trading Task Force" to "actively pursue all possible actions together with the regulators in their discovery and prosecution of persons engaging in market manipulation involving the ordinary shares of Genius Group."  Ex. 18 (1/19/23 Press Release).  Again, the company cited "proof" from Christian Attar and Warshaw Burstein "that certain individuals and/or companies appear to have sold (but not delivered) a significant amount of the of the Company's ordinary shares, as part of a market manipulation scheme seeking to artificially depress the price of the Company's ordinary shares."  *Id.*

- **February 22, 2023:** Genius announced it had estimated damages "from illegal trading to be over $150 million" and instructed Christian Attar and Warshaw Burstein "to commence legal actions where appropriate against various parties and to seek to recover liquidated damages."  Ex. 19 (2/22/23 Press Release).

- **June 28, 2023:** Genius announced the status of its investigation into market manipulation and preparation for litigation, stating that it had "completed Phase One" in December, which involved measuring and tracking allegedly "illegal trading activities," and was now "completing" Phase Two, which involved "going through all of the data crunching, going through all the numbers, identifying individual companies to take the legal action against plus most importantly putting a damages model together."  Ex. 20 (6/28/23 Investor Meeting).  Further, Genius was "about to enter" Phase Three, which involved preparing and filing a lawsuit.  *Id.*

- **December 21, 2023:** Genius's CEO released a statement approved by Christian Attar that, "following completion of a lengthy and thorough due diligence process," Christian Attar and Warshaw Burstein "believe that there is sufficient evidence to commence litigation against certain broker-dealers who engaged in a scheme to manipulate the share price of the company's securities."  Ex. 21 (12/21/23 X Post).

- **October 25, 2024:** Genius announced that Christian Attar and Warshaw Burstein had "completed their due diligence and damages report in February 2024, identifying evidence of multiple trade imbalances that suggest naked short selling and evidence of spoofing, with alleged damages calculated at between $251.3 million and $262.7 million." Ex. 22 (10/25/24 Form 6-K).

- **June 26, 2025:** Genius announced the board approved a shareholder dividend from the proceeds of this (as-yet-filed) lawsuit and the RICO Action, "seeking combined damages of over $1 billion." *See* Ex. 23 (6/26/25 Press Release). Conveniently, Genius's CEO purchased 650,000 shares two days before the company made the announcement, *see* Ex. 24 (6/24/25 Press Release), which caused a 55.4% jump in the share price. *See* Ex. 3 (Stock Price Chart).

- **August 26, 2025:** Genius's CEO Roger Hamilton and Genius's outside counsel stated that alleged market manipulation had first been identified over "2.5 years ago" and the company had identified a "very, very clear pattern" of market manipulation during the first nine months of trading following Genius's IPO in April 2022. Ex. 25 (8/26/25 Investor Call).

- **August 27, 2025:** Mr. Christian announced that Genius had focused on "spoofing allegations" for the "last 3 years" and intended to also pursue "naked short selling lawsuits" once they were able to "connect those spoofing allegations to shares sold but not delivered." Ex. 26 (8/27/25 X Post).

*See* Ex. 27 (Table of Manipulation-Related Disclosures).

Genius filed this action on November 14, 2025, nearly three years after its first disclosures alleging market manipulation, seeking to represent a putative class of investors that sold or otherwise disposed of Genius common stock between April 12, 2022 and May 30, 2025. Compl. ¶ 82. Beyond loosely pointing to trading days on which Genius allegedly issued stock and Defendants allegedly placed "baiting orders," the Complaint identifies no overlap between alleged spoofing events and the company's transactions in Genius stock. *See* Compl. ¶¶ 28-56, 82-83.

## ARGUMENT

Because Congress enacted the PSLRA "in response to perceived abuses in securities fraud class actions," the statute "provides for extensive judicial involvement in the process of selecting a lead plaintiff and lead counsel in a securities class action." *McCormack v. Dingdong (Cayman) Ltd.*, 2022 WL 17336586, at *6 (S.D.N.Y. Nov. 30, 2022) (quotation omitted). The PSLRA instructs a court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class

members." 15 U.S.C. § 78u-4(a)(3)(B)(i). The court must find the lead plaintiff both adequate and typical, *i.e.*, that (1) the lead plaintiff "fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), and (2) "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3).

"[A] proposed lead plaintiff whose application is unopposed is not automatically entitled to appointment." *Guo v. Tyson Foods, Inc.*, 2023 WL 3765052, at *2 (E.D.N.Y. June 1, 2023); *accord McCormack*, 2022 WL 17336586, at *6 ("Congress did not intend for district courts to rubber stamp motions brought by inadequate plaintiffs, even if unopposed."). Courts deny lead plaintiff appointment motions where appropriate, even when only one candidate applies. *See, e.g.*, *Bosch v. Credit Suisse Grp. AG*, 2022 WL 4285377, at *6 (E.D.N.Y. Sep. 12, 2022) (collecting cases); *Guo v. Tyson Foods, Inc.*, 2022 WL 5041798 (E.D.N.Y. Sep. 30, 2022); *McCormack*, 2022 WL 17336586. And even when no other plaintiff brings a challenge, defendants may. *See Bosch*, 2022 WL 4285377, at *6 ("[W]here, as here, only one motion for appointment has been filed, the Court 'finds that the purpose of the PSLRA in preventing "lawyer-driven" litigation is best served by having more argument, not less, from any interested source.'") (citation omitted); *Finocchiaro v. NQ Mobile, Inc.*, 2016 WL 7031613, at *2 (S.D.N.Y. Dec. 1, 2016) ("[I]n the absence of a challenge by any plaintiff, defendants certainly have standing.").

The PSLRA was intended to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R. Rep. No. 104-369, at 32 (1995). Genius nonetheless seeks to avail itself of the class action form as an issuer representing a putative class of its own stockholders. Genius's attempt to stretch the PSLRA is unfounded and its arguments unavailing. The Motion should therefore be denied.

## I.    GENIUS FAILS THE ADEQUACY TEST FOR LEAD PLAINTIFF APPOINTMENT

To make a *prima facie* showing of adequacy, a lead plaintiff must demonstrate that it "does not have interests that are antagonistic to the class that [it] seeks to represent" and "has retained counsel that is capable and qualified to vigorously represent the interests of the class that [it] seeks to represent." *Rodriguez v. DraftKings Inc.*, 2021 WL 5282006, at *8 (S.D.N.Y. Nov. 12, 2021). In appointing a lead plaintiff, the Court will adopt a rebuttable presumption that the most adequate plaintiff is the investor with "the largest financial interest in the relief sought by the class" and who "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(B)(iii)(I). This presumption may be rebutted by proof that the plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* § 78u-4(a)(B)(iii)(II). "[T]he proof needed to rebut the presumption need not establish a plaintiff's inadequacy with absolute certainty; instead it is enough that it presents a colorable risk of inadequacy." *Batter v. Hecla Mining Co.*, 2020 WL 1444934, at *7 (S.D.N.Y. Mar. 25, 2020) (quotation omitted).

Genius is an inadequate lead plaintiff due to several unique defenses as well as its history of misconduct, two issues that starkly call into question its ability to adequately protect an investor class. Even accepting Genius's assertion that the "volume of the shares [it] traded" during the putative class period means it has the "largest financial interest," ECF 28 at 6, if anything, that speaks only to its ability to establish *prima facie* adequacy and neither entitles Genius to appointment nor withstands resistance to Defendants' rebuttal arguments. *See Osorio-Franco v. Spectrum Pharms., Inc.*, 2023 WL 2586909, at *1-3 (S.D.N.Y. Mar. 21, 2023) (Caproni, J.) (declining to appoint lead plaintiff candidates with the two largest alleged losses because presumption of adequacy was overcome by vulnerability to unique defenses).

### A.    Several Unique Defenses Render Genius Unsuitable for Lead Plaintiff Appointment

Genius is subject to several unique defenses certain to distract from the issues relevant to all other putative class members.  Unique defenses are those "that, win or lose, would distract from the litigation and sap [that plaintiff's] effectiveness on behalf of the class." *Rodriguez*, 2021 WL 5282006, at *7; *see also Di Scala v. ProShares Ultra Bloomberg Crude Oil*, 2020 WL 7698321, at *4 (S.D.N.Y. Dec. 28, 2020) (denying lead plaintiff appointment motion because "factual issues unique to [the presumptive lead plaintiff] would likely threaten to become the focus of the litigation") (quotation omitted).  "[E]ven ultimately unsuccessful unique defenses may divert attention from the substance of the basic claim." *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2020 WL 5548856, at *7 (S.D.N.Y. Sept. 16, 2020) (quotation omitted).  Thus, "[b]efore disqualifying a potential lead plaintiff on that basis, the Court need not conclude that the defense is likely to or will succeed.  Rather, 'many courts have rejected appointments of lead plaintiffs based on *potential* risks.'" *Gross v. AT&T Inc.*, 2019 WL 3500496, at *2 (S.D.N.Y. July 31, 2019) (Caproni, J.) (quoting *Schaffer v. Horizon Pharma PLC*, 2016 WL 3566238, at *3 (S.D.N.Y. June 27, 2016) (collecting cases)).

The relevant "unique defenses" include Genius's claims in separate litigation that other entities' misconduct caused its stock price to fall, the untimeliness of its claims, and its lack of reliance on the market price for Genius common stock.  The Court need not resolve the merits of these defenses now—rather, the mere *risk* that these defenses may distract from issues affecting all putative class members is sufficient grounds for denying Genius's Motion.

### 1.    Genius's Claims in Separate Litigation Give Rise to Unique Damages Defenses

Genius is not qualified to serve as lead plaintiff given the inherent tension between the market manipulation claims it alleges against Defendants here and its separate fraud claims against

13

other defendants in the RICO Action. "Factors the Court may consider in determining whether a lead plaintiff can protect adequately the interests of the putative class include whether there is any conflict between the proposed lead plaintiff and the members of the class." *Christiansen v. Spectrum Pharms., Inc.*, 2025 WL 2234041, at *2 (S.D.N.Y. Aug. 4, 2025) (Caproni, J.) (quotation omitted). Courts routinely reject lead plaintiff candidates whose competing positions across different litigations give rise to conflicts with other class members. *See, e.g.*, *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharm. Indus. Ltd.*, 529 F. Supp. 3d 385, 400-01 (E.D. Pa. 2021) (declining to appoint as lead plaintiff candidates that "would be in the position of making competing arguments in this matter and [a separate] action" to "maximize their damages"); *Rice v. Genworth Fin. Inc.*, 2017 WL 3699859, at *12 (E.D. Va. Aug. 25, 2017) (declining to appoint lead plaintiff in securities fraud action that had filed separate derivative action because "the objectives of the derivative action are at odds with the objectives in this action"). Indeed, this is precisely the kind of "fundamental" conflict that defeats Rule 23's adequacy requirement.

*Halman Aldubi* is particularly instructive. There, the United States District Court for the Eastern District of Pennsylvania declined to appoint the presumptive lead plaintiff because it had pursued inherently contradictory claims in separate litigation. *Id.* at 401. The lead plaintiff candidate was seeking to represent a class of Teva investors in the Pennsylvania action alleging that specific disclosures by Teva caused the company's stock price to become artificially inflated, while also acting as plaintiff in a separate securities action pending in the District of Connecticut in which plaintiffs alleged that certain of the same statements partially disclosed the alleged misconduct and therefore deflated the company's stock price. *See id.* at 399. The District Court found that the lead plaintiff, to maximize damages in the two actions, had the incentive to argue that the disclosures maximized the inflationary impact in the Pennsylvania action, and that the

14

same disclosures maximized the deflationary impact in the Connecticut action. *See id.* at 400. The District Court therefore rejected the presumptive lead plaintiff's motion because it "would be forced to make an argument that directly contradicts their argument in the Connecticut action." *Id.* ("[T]here is a fundamental conflict between [the candidates'] interests in the Connecticut action and the class's interests in this matter, and [the court] has strong reason to question whether [the candidates] can fairly and adequately represent the interests of the class in this matter.").

Genius's competing claims in the RICO Action present a similar fundamental, irreconcilable conflict with other class members over key issues. In the RICO Action, Genius alleges that the LZG principals' fraud and extortion "led to a precipitous drop in Genius's share price and market capitalization." Compl. ¶ 166, RICO Action (ECF 1). The RICO Action complaint was filed on March 31, 2025, and alleges misconduct against Genius starting in "late 2023." *Id.* ¶ 66. In other words, the period of alleged misconduct Genius claims "led to a precipitous drop in Genius's share price" in the RICO Action overlaps entirely with the alleged class period here.

Genius's claims in the RICO Action undermine and directly conflict with the loss causation claims Genius has presented to this Court. To establish loss causation in a market manipulation case, plaintiff must adequately allege a "causal connection between the [alleged manipulation or] material misrepresentation and the loss." *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 430 (S.D.N.Y. 2010) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). Unlike other class members, Genius has conflicting incentives to attribute its alleged losses during the putative class period in two separate actions to completely unrelated, non-overlapping factual circumstances and groups of defendants. Just like in *Halman Aldubi*, to "maximize damages" in the RICO Action, Genius is incentivized to attribute as much of the share price decline as possible

15

to the RICO defendants' alleged misconduct (and to combat the suggestion that other forces, such as market manipulation, caused the decline). *See* 529 F. Supp. 3d at 400. By contrast, in this action, Genius is incentivized to attribute as much of the share price decline as possible to Defendants' alleged spoofing. Additionally, because treble damages are available under RICO, Genius has a stronger incentive to attribute alleged share price declines resulting in damages to the LZG defendants' conduct in the RICO Action over Defendants' alleged spoofing in this action. *See* 18 U.S.C. § 1964(c). Because Genius "would be forced to make an argument that directly contradicts [its] argument in the [RICO Action]" if appointed lead plaintiff, it has a "fundamental" conflict with the putative class, and its Motion should be denied. *See Halman Aldubi*, 529 F. Supp. 3d at 400.

### 2.    Genius Is Subject to a Unique Statute of Limitations Defense

Failure to timely bring suit is sufficient to disqualify a lead plaintiff candidate. *See, e.g.*, *In re Veon Ltd. Sec. Litig.*, 2022 WL 1284547, at *4 (S.D.N.Y. Apr. 29, 2022) (finding that presumptive lead plaintiff group would be "unable to adequately represent the class because [its] class claims are barred by the statute of limitations").

Genius's discovery of supposed "proof" of market manipulation well over two years before filing this lawsuit exposes Genius to a unique untimeliness defense. Exchange Act claims are timely only if brought within the earlier of "(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). The two-year statute of limitations is triggered "when the plaintiff discovers or a reasonably diligent plaintiff would have discovered the facts constituting the violation." *Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 200 (S.D.N.Y. 2020) (Caproni, J.) (quotation omitted). A fact is "deemed 'discovered' [when] a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d

169, 175 (2d Cir. 2011).  The relevant question is when the plaintiff "unequivocally knew of its

injury, including how it was caused and when it was caused."  *Chopper Trading LLC v. Allston*

*Trading LLC*, 2025 WL 3484934, at *11 (N.D. Ill. Dec. 4, 2025) (dismissing 10b-5 claims as time-

barred in spoofing case).  Critically, "the running of the statute of limitations does not await the

completion of a plaintiff's 'precomplaint investigation' and '[a] plaintiff is not required to have

collected, *before* he files suit, all the evidence he needs in order to win the suit.'"  *Id.* at *10

(quotation omitted).

      In January 2023, Genius indicated repeatedly and with certainty that its investigation had

produced "proof" and "evidence" of the alleged manipulation starting as early as "two months

after our IPO."  *See* Ex. 27 (Table of Manipulation-Related Disclosures).  Genius was "in

communication with government regulatory authorities and [] sharing information" about its

findings.  *Id.*  By June 2023, Genius had completed its analysis of the purported "illegal trading

activities" and was completing its damages analysis.  *Id.*  The Court need not look beyond Genius's

own disclosures to find it "discovered the facts constituting the violation" well over two years

before filing suit.  *See Schiro*, 438 F. Supp. 3d at 200.  Genius's claim that it was difficult to

determine the "identities of the perpetrators of these [alleged] schemes," Compl. ¶ 94, does not

excuse its delay because Genius "had the option of filing suit against 'doe defendants' and seeking

discovery to determine which one of [the] trading firms was responsible for the spoofing within

the statute of limitations period."  *Chopper Trading*, 2025 WL 3484934, at *11.

      Although all putative class members may be subject to a statute of limitations defense

based on when a reasonable plaintiff "would have discovered the facts constituting the violation,"

*Schiro*, 438 F. Supp. 3d at 200, Genius will be subject to a unique defense regarding its actual

knowledge of the alleged fraud based on its reportedly fruitful, multi-year investigation.  This fact-

intensive inquiry is certain to distract from issues common to the class and is further grounds to deny Genius's Motion. *See Veon*, 2022 WL 1284547, at *4.

### 3. Genius Is Subject to a Unique Reliance Defense

Genius's decision to trade despite its admitted belief that its stock was being manipulated subjects it to a unique reliance defense.

Pleading market manipulation requires "reliance on an assumption of an efficient market free of manipulation." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). Failure to demonstrate such reliance defeats a market manipulation claim. *See, e.g.*, *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011) ("Plaintiffs were not ignorant of the manipulation of the price of RMDX stock that they now claim to be victims of, and so cannot establish that they relied on [a] market free of manipulation."), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012); *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999) (affirming dismissal of manipulation claim where "[b]y plaintiff's own admission" plaintiff could not establish "that he . . . engaged in a securities trade in ignorance of the fact that the price was affected by the alleged manipulation").

Lead plaintiff candidates "subject to an arguable defense of non-reliance on the market" have been found to be inadequate. *Hebron*, 2020 WL 5548856, at *7 (quotation omitted); *see also In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 482-83 (S.D.N.Y. 2002) (denying lead plaintiff appointment motion because "[t]he unique defense of 'non-reliance' on the integrity of the market would shift the focus of the litigation to the prejudice of the class members").

Genius alleges that it is entitled to a "fraud on the market" presumption of reliance. Compl. ¶¶ 80-81. The presumption is based on the theory that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price," which reflects publicly

available information.  *Basic Inc. v. Levinson*, 485 U.S. 224, 247-48 & n.27 (1988).  The presumption, however, is rebuttable.  *Id.* at 248.

Genius's investigation of alleged market manipulation demonstrates why it could not have sold shares in "reliance on an assumption of an efficient market free of manipulation."  *ATSI*, 493 F.3d at 101.  Genius cannot on the one hand repeatedly announce that its stock is being manipulated, while also claim that it relied on the integrity of the market price of the stock.  In fact, Genius suspected manipulation as early as November 10, 2022; claimed to have "proof" of a purported "market manipulation scheme" by January 2023; had completed its analysis of the trading data and identified the individual companies to sue for its alleged damages by June 2023; and by February 2024, Genius's outside counsel had "completed their due diligence and damages report," identifying "evidence of spoofing."  *See* Ex. 27 (Table of Manipulation-Related Disclosures).  In October 2024, Genius announced that it had calculated damages at "between $251.3 million and 262.7 million," and that its outside counsel had secured third-party funding for the lawsuit.  *Id.*  Genius's years-long investigation into purported manipulation demonstrates why Genius was not "ignorant" of the purported "manipulation of the price of [GNS] stock that [it] now claim[s] to be [a] victim[] of, and so cannot establish that [it] relied on a market free of manipulation."  *Alki*, 769 F. Supp. 2d at 493.

Genius's disclosures also raise questions relevant to the entire putative class as to whether any putative class member's reliance on a market free from manipulation was reasonable.  With respect to Genius, however, these disclosures raise a unique defense that Genius *in fact* either did not rely on the integrity of the market price for Genius stock given the company's actual knowledge of the findings and conclusions of its investigation, or it made publicly misleading statements.  Genius's lack of reliance will be a core disputed issue, and this unique defense is certain to distract

from issues common to the putative class. *See, e.g.*, *Steginsky v. Xcelera, Inc.*, 2015 WL 1036985, at *7 (D. Conn. Mar. 10, 2015) (declining to appoint class representative who "firmly believed a fraud was afoot"), *aff'd*, 658 F. App'x 5 (2d Cir. 2016).

**B.    Genius's Misconduct Casts Further Doubt on Its Ability to Serve as Lead Plaintiff**

Serious findings and allegations of wrongdoing by Genius further demonstrate why Genius should not serve as a fiduciary for other putative class members. Courts routinely consider lead plaintiff candidates' "honesty and trustworthiness." *Christiansen*, 2025 WL 2234041, at *2 (citing *Savino v. Comput. Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998)). Prior "investigations, charges, and determinations of wrongdoing" are all relevant to the adequacy determination. *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2008 WL 2941215, at *6 (S.D.N.Y. July 30, 2008). Even unproven allegations of wrongdoing are relevant to this analysis. *See, e.g.*, *Faris v. Longtop Fin. Techs. Ltd.*, 2011 WL 4597553, at *8 (S.D.N.Y. Oct. 4, 2011) ("Whether or not the Trustees' claims are eventually proven to be true is irrelevant. The Trustee's allegations that [a lead plaintiff candidate] knowingly profited from victims of a Ponzi scheme certainly subjects it to a unique defense atypical of the conduct expected of a lead plaintiff."); *In re Network Assoc., Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1029 (N.D. Cal. 1999) (declining to appoint as lead plaintiff financial institution subject to fraud allegations in unrelated proceedings). Genius's misconduct makes it an inadequate lead plaintiff for multiple reasons.

*First*, in 2023, Genius issued a press release disclosing that NYSE concluded that it "fail[ed] to disclose material information" and "provid[ed] inconsistent information to the investing public." Ex. 4 (8/1/23 Press Release); *cf. Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499, 504 (S.D. Fla. 2002) ("Having been found by the SEC and the NASD to have violated certain securities laws, [lead plaintiff candidate] may be subject to unique defenses that might imperil

certification of a class in this case.  Furthermore, [his] violations raise concerns about his moral character.").  NYSE's finding is even more concerning here, where the investors Genius was found to have provided misleading information to are the very same investors Genius now seeks to represent on a class-wide basis.

*Second*, the extensive allegations of mismanagement and financial aid fraud at UAV after it was acquired by Genius cast doubt on Plaintiff's fitness to serve as a fiduciary.  Among the more striking allegations and compelling indicators of Genius's involvement in UAV's financial mismanagement was that, due to cashflow shortages, UAV employees received only 25% of their salary in cash with the rest paid in Genius shares.  *See* Ex. 9 (2/22/24 Inside Higher Ed Article).  California state education regulators placed UAV on probation and ultimately compelled UAV to suspend all operations.  *See* Ex. 6 (8/22/23 WSCUC Action Letter); Ex. 7 (2/29/24 CBPPE Notice and Emergency Decision); Ex. 8 (5/10/24 WSCUC Action Letter).  UAV was later found to have made "untrue or misleading statements" to the Department of Education regarding its disbursements of financial aid to students.  Ex. 10 (Surrender Order) at Ex. A, 14.  UAV's CFO, a Genius employee, was accused of playing a key role in efforts to withhold financial aid from UAV students.  *Id*.  Whatever the nature and extent of Genius's role in deliberately withholding financial aid funds from students and lying to the Department of Education, such conduct "is atypical of the conduct expected of a lead plaintiff" and demonstrates why Genius should not be entrusted with such responsibilities.  *See Faris*, 2011 WL 4597553, at *8.

## II.    GENIUS FAILS THE TYPICALITY REQUIREMENT FOR LEAD PLAINTIFF APPOINTMENT

A lead plaintiff's claims "are typical where 'each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'"  *Hebron*, 2020 WL 5548856, at *5 (quotation omitted).  Courts routinely

find typicality defeated when the movant executed transactions that differ from those executed by other putative class members. *See, e.g.*, *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *19 (S.D.N.Y. Oct. 29, 2013) (plaintiffs' operation as in-and-out traders "alone defeats certification"); *Andrada v. Atherogenics, Inc.*, 2005 WL 912359, at *5 (S.D.N.Y. Apr. 19, 2005) (denying lead plaintiff motion because investor purchased call options and not common stock like most putative class members).

Genius lacks typicality because, as the issuer transacting in its own stock, it engaged in materially different transactions from the rest of the putative class. Unlike other putative class members, Genius executed numerous transactions at *contractually set prices other than the market price*. These issuances—which Genius claims as losses in this case—categorically differ from public market sales by other putative class members and further underscore why Genius's unprecedented request to represent a putative class of its own stockholders should be rejected.

"The manner in which a potential lead plaintiff acquired shares may affect that plaintiff's ability to represent the class." *Lang v. Tower Grp. Int'l, Ltd.*, 2014 WL 12779212, at *3 (S.D.N.Y. June 17, 2014) (declining to appoint as lead plaintiff movant who acquired at least 35% of its shares through private placement and at a discount). That is particularly so where the lead plaintiff candidate transacted through private transactions rather than at market prices. *See, e.g.*, *In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1110-11 (N.D. Cal. 2001) ("Certainly the Court should not appoint as lead plaintiff one whose appointment will invite scrutiny of the details of a private transaction."). The manner in which Genius "sold or otherwise disposed" of its shares undermines its ability to represent other putative class members for several reasons. *See* ECF 28 at 6-7.

*First*, Genius issued millions of shares to noteholders exercising conversion rights under convertible notes.  Honoring such conversion requests "does not constitute a sale or purchase of a security and thus does not . . . confer standing to assert a market manipulation claim." *Endovasc Ltd., Inc. v. J.P. Turner & Co., LLC*, 2004 WL 634171, at *12 (S.D.N.Y. Mar. 30, 2004) (quotations omitted), *aff'd in part, vacated in part*, 169 F. App'x 655 (2d Cir. 2006); *accord May v. Barclays PLC*, 2025 WL 887300, at *12 (S.D.N.Y. Mar. 21, 2025) (exercising a conversion right "does not ordinarily give rise to a 'sale' of the new security[.]"); *Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 536 (7th Cir. 1998) ("[T]here can be no suit under the securities laws by someone who has not made an investment decision, that is, who has not made a choice . . . to buy or sell securities.").  Since 2019, Genius has issued over 46 million shares pursuant to convertible notes at contractually mandated prices. Ex. 12 (2022 Form 20-F) at F-35; Ex. 11 (2023 Form 20-F) at F-44.  Fulfilling such contractual obligations reflects no "investment decision" on Genius's part and is categorically different from open market sales of common stock executed by the putative class. *See May*, 2025 WL 887300, at *11.

*Second*, Genius's stock issuances to options holders are atypical of putative class members' stock sales.  In the case of employee stock options, "the affirmative investment decision is made when the employees decide whether to exercise their options." *Lampkin v. UBS Fin. Servs.*, 925 F.3d 727, 736 (5th Cir. 2019); *accord May*, 2025 WL 887300, at *11 ("[A]n investor who exercises an option, exchanging the right to obtain a share of stock in exchange for the actual share, does not purchase or sell the share of stock.").  In 2022, 73,428 options issued as stock-based compensation were exercised for Genius common stock. Ex. 12 (2022 Form 20-F) at F-38.  Genius made no "investment decision" here; common stock issuances to employee option holders who exercised options at a fixed strike price are fundamentally different from market-based sales.

*Third*, Genius has raised financing through agreements with warrant holders providing for the exercise of their warrants at fixed prices in exchange for cash and millions of newly issued company shares. Ex. 13 (5/20/24 Press Release). These shares were not issued in reliance on the market price for Genius common stock, and further underscore the distinction between Genius's stock issuances and other putative class members' stock sales. *See, e.g.*, *EMA Fin., LLC v. NFusz, Inc.*, 444 F. Supp. 3d 530, 544 n.19 (S.D.N.Y. 2020) (warrants represent "the option to purchase shares of common stock at a fixed price in the future").

*Fourth*, Genius repeatedly agreed to issue a set number of shares at set prices as consideration in merger transactions. For example, in the acquisition of a company from LZG, Genius issued over 73 million shares of common stock. Ex. 28 (Prime Source Group, Combined Financial Statements 2022-2023, Ex. 21.1(b)). The number of shares issued was fixed and not dependent on the market price of Genius stock. *See* Ex. 29 (2024 Form F-1). Genius's use of common stock as merger consideration bears no resemblance to other putative class members' stock sales. *See Critical Path*, 156 F. Supp. 2d at 1110-11 ("Exposure to the concerns raised by a private transaction would disserve the class that the Court is charged with protecting[.]").

*Finally*, by issuing additional shares of common stock, Genius's "sales" during the putative class period were inherently dilutive and would have placed downward pressure on the company's stock price irrespective of any alleged spoofing. Because no other putative class members' stock sales had the same dilutive effect, Genius's issuances are fundamentally different from other investors' stock sales. *Cf. Lang*, 2014 WL 12779212, at *3 ("[A]typicality of [movant's] acquisition" of shares precluded lead plaintiff appointment).

Genius's transaction history confirms the fundamental distinctions between Genius's disposing of common stock and other putative class members' stock sales in the public market.

And while Genius claims that certain, unspecified share issuances were sold "through at-the-market offerings," *see* ECF 28 at 2, 5, the vast majority were not.  These issues confirm Genius's inability to satisfy the typicality requirement and provide ample reason to reject Genius's attempt to leverage its trading record as "a proxy for the class."  *See Hebron*, 2020 WL 5548856, at *7.

## III.    PROPOSED CO-LEAD CLASS COUNSEL IS INADEQUATE

Genius's proposed co-lead counsel, Christian Attar, is not qualified to serve as lead counsel given its history of misconduct.  A plaintiff's selection and retention of class counsel is "subject to the approval of the court."  15 U.S.C. § 78u-4(a)(3)(B)(v).  Thus, the Court has discretion to reject the choice of counsel when "necessary 'to protect the best interests of the class.'"  *Weltz v. Lee*, 199 F.R.D. 129, 134 (S.D.N.Y. 2001); *accord Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 540 (S.D.N.Y. 2015).  "Courts in this district have found the fact that an attorney or law firm has been sanctioned is evidence that they are inadequate class counsel in any role."  *Wang v. Shun Lee Palace Rest., Inc.*, 2023 WL 2734328, at *7 (S.D.N.Y. Mar. 31, 2023) (quotation omitted).  "When determining whether disqualification of counsel is appropriate . . . any doubt with respect to whether disqualification should be ordered is to be resolved in favor of disqualification."  *Mura v. Thomas*, 2020 WL 2086039, at *4 (S.D.N.Y. Apr. 30, 2020) (cleaned up).

Mr. Christian, a named partner of the five-lawyer Christian Attar law firm, has pursued numerous manipulation claims unrelated to Genius, generally unsuccessfully.[3]  Mr. Christian was previously sanctioned in a market manipulation case in this District.  *See ATSI Commc'ns, Inc. v.*

---

[3]    *See* Brandon Kochkodin, "The Loony Conspiracy Theory Threatening Wall Street," FORBES (Jun. 22, 2023) (describing Mr. Christian as pursuing "laughably absurd" legal theories "with the absolutism, ignorance and digital tools of QAnon" and noting: "[T]here's always a CEO, it seems, looking for a performance excuse that doesn't have anything to do with his or her own competence.").

*Shaar Fund, Ltd.*, 2008 WL 850473, at *3 (S.D.N.Y. Mar. 27, 2008). Judge Kaplan found the operative complaint was "presented for an improper purpose" and plaintiff's attorneys, including Mr. Christian, had raised allegations against one defendant that "lacked any reasonable factual basis for asserting that [the defendant] had violated the federal securities laws." *Id.* Judge Kaplan found Mr. Christian had presented "baseless" allegations and found it "simply ridiculous" that plaintiff's only basis for asserting a manipulation claim against a defendant was that it was "the principal market maker, that it therefore must have known that [other co-defendants] were engaged in manipulation, and that [defendant] therefore must have been complicit." *Id.* at *3-4. The Second Circuit affirmed the sanctions order, finding that plaintiff's counsel had "relied on speculation." *See ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*, 579 F.3d 143, 153 (2d Cir. 2009). Two additional sanctions motions are currently pending against Mr. Christian in other cases.[4]

The sanctions issued against Mr. Christian demonstrate that he and his firm are unfit to serve as class counsel. *See Wang*, 2023 WL 2734328, at *7. Although imposed some time ago, these sanctions warrant consideration, not only because imposing Rule 11 sanctions is "reserved for extreme cases," *Biocad JSC v. F. Hoffmann-La Roche Ltd.*, 2022 WL 268102, at *3 (S.D.N.Y. Jan. 28, 2022) (quotation omitted), but also because the two pending sanctions motions against Mr. Christian allege he has more recently engaged in similar misconduct, including in another pending market manipulation case in this District. At minimum, the misconduct findings against Mr. Christian and similar allegations in other pending actions create ample "doubt" about Christian

---

[4] *See* Letter re: Proposed Motion for Sanctions and Costs, *Bollinger Innovations, Inc. v. Clear Street Mkts. LLC*, No. 23-cv-10637 (S.D.N.Y.) (ECF 40) (alleging Mr. Christian filed a complaint based on "demonstrably false allegations" in another "spoofing" case); Defs.' Motion for Sanctions Against Pl.'s Attorneys, *Woodall v. Walt Disney Co.*, No. 2:20-cv-3772 (C.D. Cal.) (ECF 829) (alleging Mr. Christian knowingly asserted false claims premised on a forged confidentiality agreement).

Attar's suitability to represent a class of investors, which must be resolved "in favor of disqualification." *Mura*, 2020 WL 2086039, at *4.

Denying Christian Attar's appointment as co-lead counsel will also help to avoid potentially "significant adverse consequences if three firms are appointed as co-counsel," including internal disagreement, case management issues, and excessive fees. *Patel v. St. John's Univ.*, 2020 WL 13157553, at *3 (E.D.N.Y. Dec. 27, 2020); *accord Malasky v. IAC/Interactivecorp*, 2004 WL 2980085, at *5 (S.D.N.Y. Dec. 21, 2004) ("[T]hree law firms may compromise the class through disagreement and/or duplicative or unnecessary legal fees[.]") (collecting cases). A lead plaintiff seeking to appoint even just two firms "must explain why the retention of two law firms is appropriate and necessary to adequately represent the putative class." *Berdeaux v. Onecoin Ltd.*, 2019 WL 3815147, at *1 (S.D.N.Y. July 11, 2019) (Caproni, J.); *see also Gamm v. Sanderson Farms, Inc.*, 2017 WL 11710545, at *2 (S.D.N.Y. Feb. 13, 2017) ("Where, as here, there is no demonstrable [and articulated] need for more than one law firm to represent the class, it is proper to reject a request to appoint co-lead counsel.") (citation omitted). Genius offers no such explanation. While Genius claims Christian Attar has "experience prosecuting claims involving 'spoofing,'" Christian Attar has never secured *any* award in *any* spoofing case. ECF 28 at 3. Appointing Christian Attar as co-lead counsel would therefore only result in unwarranted inefficiencies without any offsetting benefits to putative class members.

## CONCLUSION

For the foregoing reasons, Genius's motion for appointment as lead plaintiff and approval of co-lead counsel should be denied.

Dated: January 20, 2026

SIMPSON THACHER & BARTLETT LLP

 /s/ Jonathan K. Youngwood
Jonathan K. Youngwood
Meredith Karp
Jacob Lundqvist
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
jyoungwood@stblaw.com
meredith.karp@stblaw.com
jacob.lundqvist@stblaw.com

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

Christopher D. Kercher
Peter H. Fountain
Leigha Empson
Ted Ovrom
295 Fifth Avenue
New York, NY 10010
Tel: (212) 849-7000
christopherkercher@quinnemanuel.com
peterfountain@quinnemanuel.com
leighaempson@quinnemanuel.com
tedovrom@quinnemanuel.com

Avi Perry
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202) 538-8330
aviperry@quinnemanuel.com

Attorneys for Citadel Securities LLC

PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP

 /s/ Audra J. Soloway
Audra J. Soloway
Daniel S. Sinnreich
Daniel Negless
1285 Avenue of the Americas
New York, NY 10019

28

Tel: (212) 373-3000
asoloway@paulweiss.com
dsinnreich@paulweiss.com
dnegless@paulweiss.com

*Attorneys for Virtu Americas LLC*

## **WORD COUNT CERTIFICATION**

The undersigned counsel hereby certifies that the above Defendants' Memorandum of

Law in Opposition to Genius Group Limited's Motion for Appointment as Lead Plaintiff and

Approval of Lead Counsel, dated January 20, 2026, contains 8,734 words, which is fewer than

the limit imposed by Rule 7.1(c) of the Local Rules of the United States District Courts for the

Southern and Eastern Districts of New York. Counsel relied upon the word count feature of

Microsoft Word in preparing this certification.


This 20th day of January, 2026.

*/s/ Jonathan K. Youngwood*
Jonathan K. Youngwood

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on January 20, 2026, a true and correct copy of the foregoing

Defendants' Memorandum of Law in Opposition to Genius Group Limited's Motion for

Appointment as Lead Plaintiff and Approval of Lead Counsel was electronically filed using the

Court's Case Management/Electronic Case Filing system ("CM/ECF").  Notice of such filing

was sent to all parties to this action who may access the filings through CM/ECF.


This 20th day of January, 2026.

                                              */s/ Jonathan K. Youngwood*
                                              Jonathan K. Youngwood

31